**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| GENZYME CORPORATION and<br>SANOFI-AVENTIS U.S. LLC,<br><br>Plaintiffs/Counterclaim-Defendants,<br><br>v.<br><br>DR. REDDY'S LABORATORIES, LTD. et al,<br><br>Defendants/Counterclaim-Plaintiffs | C.A. No. 13-1506-GMS<br>(consolidated) |

**DECLARATION OF ANTHONY PALMIERI III, Ph.D., R.Ph.**
**IN SUPPORT OF SANDOZ INC.'S CLAIM CONSTRUCTION BRIEF**

## I. INTRODUCTION.

1. I, Anthony Palmieri III, Ph.D., have personal knowledge of the facts set forth in this Declaration and am competent to testify to the same.

2. I understand that I am providing this Declaration in support of Defendant Sandoz Inc.'s ("Sandoz's") proposed claim construction of the claim term "in admixture or association with".

3. This Declaration contains my opinions based on my expertise and my review of U.S. Patent No. RE 42,152 ("152 patent") and its prosecution history; the factual basis for those opinions; data or other information I considered in forming my opinions; and my qualifications (including a list of publications authored or co-authored by me).

4. The opinions and facts set forth in this declaration are based upon my analysis of the 152 patent and its prosecution history, as well as my knowledge and experience in the areas of pharmaceutical chemistry and formulation. It is my understanding that factual discovery is ongoing, and expert discovery has yet to begin. I reserve the right to supplement or amend this declaration based on additional information made available to me, including in light of any expert reports or declarations submitted on behalf of Plaintiffs, or in order to clarify the information provided herein. I also reserve the right to opine on additional topics in future declarations or reports in this matter.

5. If called upon, I am prepared to testify about my background, qualifications, and experience, as well as about the issues set forth in this Declaration.

## II. QUALIFICATIONS.

6. I am currently an Associate Scholar of Pharmaceutics at the University of Florida.

7. I obtained a B.S. in Pharmacy in 1971 from the University of Rhode Island and an M.S. in Pharmacy in 1973 from the University of Rhode Island.

8. I obtained my Ph.D. in Pharmaceutics from the University of Georgia in 1976.

9. I have worked as a pharmacist in both Georgia and Rhode Island.

10. I joined the University of Wyoming as an Assistant Professor of Pharmaceutics in 1975, and I was promoted to Associate Professor of Pharmaceutics (tenured) in 1980.

11. I joined The Upjohn Company as a Senior Patent Liaison Scientist in 1984. In 1988, I was promoted to Manager in the Intellectual Property Department where, in 1992, I became Manager in the Intellectual Property and Research Contracts Department. In 1994, I was promoted to Manager in the Technology Protection and Tracking Department, and then in 1996, I was promoted to Manager in the Technology Protection Department. All of these positions were in the Research & Development division of the company.

12. I joined The University of Florida as an Assistant Director of the Office Technology Licensing Department in 2000, as well as an Adjunct Professor in Pharmaceutics.

13. In 2006, I became a Clinical Assistant Professor of Pharmaceutics. In 2011, I became an Assistant Scholar of Pharmaceutics. In 2013, I became an Associate Scholar of Pharmaceutics.

14. I have taught both pharmacy students and graduate pharmaceutics students for over 35 years. During this time span I have taught both lectures and laboratory exercises about pharmaceutical formulation and related topics.

15. I am the author of monographs in the Handbook of Pharmaceutical Excipients concerning various topics, and have reviewed for scientific accuracy monographs concerning various topics prior to their inclusion in the Handbook.

16. I have prepared numerous dosage forms that employ a variety of excipients and carriers.

17. Further details of my academic and professional pursuits, including my educational background, professional experience, honors and fellowships, and publications are set forth in my Curriculum Vitae, attached hereto as Exhibit A.

## III. SCOPE OF ASSIGNMENT

18. I have been retained by Sandoz to consult regarding claim construction of the '152 patent, and to provide my opinions related to the construction of certain claim terms within the '152 patent. As such, I have been asked to review the '152 patent and its prosecution history.

19. I also understand that the Court will only consider the opinions of a "person of ordinary skill in the art," and I believe that I was such a person in 1992. More specifically, I understand that the development of pharmaceutically effective compositions is multi-disciplinary, utilizing contributions of individuals from various disciplines (including but not limited to biology, medicine, chemistry, pharmacology, formulation, and drug delivery). Also, persons developing pharmaceutical compositions generally have an advanced degree, as well as research experience. As set forth in Paragraphs 7-11 of this Declaration, I met all of these qualifications in 1992.

20. I provide my interpretations regarding the proper construction of the claim term "in admixture or association with" from the point of view of a person with an advanced degree in pharmaceutics and experience in pharmaceutics and pharmaceutical formulation. (*See* ¶¶ 5-16 *supra*).

21. I understand that Genzyme and Sanofi ("plaintiffs") have asked the court to construe the term "in admixture or association with a pharmaceutically acceptable diluent or carrier" and have proffered a construction of: "Plain and ordinary meaning, *i.e.*, mixed or combined with a pharmaceutically acceptable diluent or carrier."

22. I further understand that Sandoz has asked the court to construe the claim term "in admixture or association with" and has proffered a construction as follows:

| Sandoz's Proposed Construction |
| --- |
| There are multiple concepts that can be associated with the plain and ordinary meaning(s), including but not limited to:<br>1. Covalently or otherwise chemically bonded;<br>2. Capable of physical interaction with each other;<br>3. Physically associated, *e.g.*, by solvation, co-crystallization, or forming a solid solution;<br>4. Physically associated, *e.g.*, by any molecular forces;<br>5. Physically associated with direct physical contact, *e.g.*, forming layers, by encasement;<br>6. Physically associated without direct contact, *e.g.*, separated by another material;<br>7. Preferred to be used together;<br>8. Understood to be suitable for use together;<br>9. Sold together;<br>10. Packaged together; and<br>Any other correlation, physical or chemical interaction, or proximity.[1] |

## IV. OPINIONS

23. I agree with Sandoz that there are multiple concepts that can be associated with the plain and ordinary meaning(s) of "in admixture or association with," including but not limited to those recited in Sandoz's construction. Thus, I agree with Sandoz's construction, and the reasons for my agreement are set forth below.

### A. "IN ADMIXTURE OR ASSOCIATION WITH "

24. As a threshold issue, I believe "admixture" to be a recognized term of art in the field of pharmaceutics or pharmaceutical formulation, meaning mixing two or more chemical compounds without creating a chemical reaction. It is my opinion, however, that the term "association with" is ***not*** a recognized term of art in the field of pharmaceutics or

[1] I understand that Sandoz does not intend for this list to be comprehensive or exhaustive.

pharmaceutical formulation. I do not routinely use that term when referring to my own work and have not heard my colleagues use that term when discussing formulations and/or formulation science.

*The Specification*

25. I have reviewed the specification of the 152 patent, including the claims, and have concluded that the teachings of the specification supports Sandoz's position that there are multiple and varied meanings that can be attributed to the term "association with."

26. The specification discloses several examples in which 1,1'-[1,4-phenylenebis(methylene)-bis-1,4,8,11-tetra-azacyclotetradecane ("plerixafor") and related compounds may be found "in association" with other components.

27. For example, the specification discloses that "[t]he invention further provides pharmaceutical compositions comprising a said compound in combination or association with a pharmaceutically acceptable diluent or excipient, for the treatment of HIV-infected patents [sic]." (152 at 1:38-41).

28. However, the specification does not limit or otherwise define what is encompassed by the use of the terms diluents and excipients.

29. Based upon my experience, the terms diluents and excipients, and the term used in the claims, carrier, could encompass a large variety of materials and therefore many different types of associations; diluents and/or excipients and/or carriers may be found in the same dosage form as plerixafor, but not in direct contact or chemically bonded in any way, or they may be found in the same dosage form in physical contact with one another.

30. The specification also discloses that acid addition salts such as hydrochlorides may also be associated with the claimed compound. (152 at 4:19). Such interactions are likely to involve ionic bonding.

31. Further, the specification provides that the scope of the invention may include the claimed compounds in association with various metals. (152 at 4:20-27 ("[c]opper and zinc complexes are preferred although other metals such as nickel may be considered, whereas less labile metal atoms such as cobalt and rhodium are less preferred…")). These interactions are also likely to include ionic bonding.

32. In addition, the specification used the term "associated" in referring to the binding between protein and RNA. (152 at 17:27-34). Protein-nucleic acid binding may take the form of hydrogen bonding, van der Waals forces or other types of non-covalent associations and in some cases may even include covalent interactions.

33. The specification also includes a citation to a European patent publication, EP-A-0296522, and a discussion of its disclosure of cyclic polyamines forming complexes with antibodies or antibody fragments. (152 at 2:18-21). Such interactions are likely to involve covalent as well as non-covalent interactions and, from the perspective of a person of ordinary skill in the art, I would understand that to mean that the cyclic polyamine, in that scenario, is "in association with" the antibody or antibody fragments.

34. In addition, the specification discloses the use of prodrug forms of the claimed compounds. (152 at 3:12-20). The specification describes these as "protected forms of the linked cyclic compounds, which release the compound after administration to a patient." (*Id*.)

35. One of ordinary skill in the art would recognize that there are a large number and variety of potential prodrug moieties that can be appended to an active compound for the purpose of carrying that active compound across biological membranes, through harsh chemical environments or for other purposes. Indeed, the potential prodrug moieties one could consider are too numerous to list here.

36. However, commonly used examples include, but are not limited to, those described in Smith and Williams' Introduction to the Principles of Drug Design, cited by the applicants in the 152 specification. (152 at 3:12-20). These interactions are also likely to involve covalent and other types of associations.

37. In sum, the specification refers to interactions as diverse as metal-chelate complexes; nucleic acid-protein interactions; antibody complexes; prodrug modifications; and broad and generalized references to diluents, excipients and carriers, and provides numerous and varied examples of what one of ordinary skill in the art might consider components in "association with" the claimed compounds. In addition, the ionic, covalent and other types of interactions and bonding disclosed in the specification are also consistent with Sandoz's construction to the extent that the construction includes "covalent or otherwise chemically bonded;" "capable of physical interaction with each other;" "physically associated;" and "[a]ny other correlation, physical or chemical interaction, or proximity.

38. Any of these may be considered interactions that might fall within the scope of the term "in admixture ***or association with***" and therefore the specification does nothing to define the term, narrow the scope of, or otherwise confine the disputed claim term to a single, accepted "plain and ordinary meaning."

39. Thus, from the perspective of one of ordinary skill in the art, I would not consider any of the disclosures in the specification to be the sole "plain and ordinary meaning" of the term "in admixture or association with."

*The Prosecution History*

40. I also reviewed the prosecution history of the 152 patent to determine whether it shows what the alleged plain and ordinary meaning of the term "in admixture or association with" might be.

41. The prosecution history of the 152 patent thus shows that Sandoz's proposed construction is the proper one because it shows that there can be multiple "plain and ordinary" meanings for "in association."

42. For example, on August 15, 2008, at the commencement of prosecution, the applicants filed a Preliminary Amendment in which the applicants added the phrase "in admixture or association with a pharmaceutically acceptable diluent or carrier" to several of the claims. (GNZ001787-1791).

43. The applicants explained to the Examiner that the added language "simply makes explicit that which was previously implicit, namely that the claimed 'pharmaceutical composition' comprises *components* in addition to the active compound." (GNZ001798) (emphasis added). To a person of ordinary skill in the art, "component" is a very broad term and the applicants did not attempt to specify or otherwise confine the scope of that term.

44. On August 18, 2009, the PTO issued an Office Action in which the Examiner rejected certain claims because, as the Examiner stated, there was no support for "admixture" in the specification. The Examiner also explained that admixture has a

different, narrower meaning than the term combination, stating that "[t]wo compounds can be in 'combination' while setting in two separate vials on a laboratory bench next to each other, but those compounds would not be in 'admixture'. Combination indicates a collection of distinct components, whereas admixture indicates a state of being mingled or mixed." (GNZ002018-2019). Thus, "combination" was treated by the Examiner---without argument from the applicants---as being very broad. The same applies to the term "association."

45. I also note that the applicants appeared to use the terms "in combination" and "in association" interchangeably, (*see, e.g.*, 152 at 1:39-40), and therefore I consider the statements made by the Examiner about the term "combination" to be relevant to my analysis of the term "association with."

46. I further note that the applicants never contested the Examiner's characterization of these terms and thus never attempted to limit or define the terms "combination" or "association." (GNZ002256-2258).

47. Thus, in light of the above, and given that plaintiffs' construction merely substitutes "in association" with "combined," plaintiffs' construction does nothing to resolve the ambiguity in the claim term, and cannot be correct.

48. The August 18, 2009 Office Action is also consistent with Sandoz's proposed construction - just as two items can be in combination by resting near each other on a lab bench, components can be in association just by being used together; suitable for being used together; packaged together; administered together; sold together; etc.

49. In conclusion, the applicants never attempted during prosecution to confine the scope of the term to a single meaning that could be understood by one of ordinary skill

in the art to be the "plain and ordinary meaning."

50. I also considered the references cited by the applicants and submitted to the USPTO during prosecution. I note that Momenteau et al., (J. Chem. Soc. Perkin Trans. (1985)), submitted by the applicants to the USPTO in a Jan. 19, 2010 Information Disclosure Statement, uses the term "associated" to refer to molecular dimerization. ((GNZ002435) ("…bimolecular associations typical for this class of compounds have been detected except for the most hindered.").

51. In addition, I also note that WO 91/05762 ("WO 762"), cited by the applicants during prosecution, describes metal cations "associated" with various chelants. (WO 762 at 23-24 ("…$Na^+$ or $K^+$, additionally associated with the chelant…"); and 25 ("…stability of ligand-metal association…").

52. Accordingly, it is clear from the intrinsic record that the diverse disclosures from the specification and references cited during prosecution of components that could be considered in "association with" the claimed compound, and the broad treatment of the term "combination" during prosecution, indicate that there is no single accepted meaning for the term "in admixture or association with."

53. Therefore, each of the possibilities included in Sandoz's construction are all equally plausible to a person of ordinary skill in the art.

## V. PREVIOUS TESTIMONY AND COMPENSATION

54. I have been retained by Sandoz Inc. as an expert consultant, and my time spent on this project is compensated at $500 per hour. My compensation does not depend in any way on the outcome of this litigation.

55. In the last four years, I have testified as an expert at trial or deposition in the following cases:

a. *Genentech, Inc. et al. v. Sandoz Inc./Apotex Inc.*, Nos. 3:11-cv-1925-JSW, 3:11-cv-2410-JSW (N.D. Cal.) (deposition);

b. *Pozen Inc. v. Par Pharm., Inc./Alphapharm Pty Ltd. et al./Teva Pharm. USA Inc*., Nos. 6:08-cv-0437-LED, 6:09-cv-0003-LED, 6:09-cv-0182-LED (E.D. Tex.) (deposition and trial);

c. *Cadence Pharm., Inc. et al. v. Paddock Labs. et al.*, No. 1:11-cv-733-LPS (D. Del.) (deposition and trial);

d. *Ferring B.V. v. Watson Labs., Inc.-Florida et al./Apotex Inc. et al.*, No. 3:11-cv-00481-RCJ-VPC and related cases (D. Nev.) (deposition);

e. *Takeda Pharm. Co. Ltd. et al. v. Mylan, Inc. et al.*, No. 1:12-civ-24-DLC (S.D.N.Y.) (deposition);

*f.* *Purdue Pharma L.P. et al. v. IMPAX Labs., Inc./Sandoz Inc./Amneal Pharm., LLC,* Nos. 1:11-CV-2400-SHS, 1:11-cv-4694-SHS, 1:12-cv-897-SHS, 1:11-cv-8153-SHS (S.D.N.Y.) (deposition);

g. *Alcon Canada Inc. et al. v. Apotex Inc.,* T-1516-12 (Canada) (deposition);

*h.* *Anacor Pharm. Inc. v. Valeant Pharm. Int'l Inc.,* JAMS Reference No. 1100072088 (arbitration) (deposition and witness at hearing);

i. *Teva Branded Pharm. Products R&D, Inc. v. Perrigo Pharms. Co.*, No. 1:12-cv-1101-GMS (consolidated) (D. Del.) (deposition).

* * *

I declare under penalty of perjury that I believe the foregoing is true and correct, to the best of my knowledge and ability.

Dated: 7/8/14

Anthony Palmieri, Ph.D.

Anthony Palmieri III, Ph.D.